PJS:MJB:CER

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN A. SMITH,** | : | **No. 4:10-CV-781** |
| **Plaintiff** | : | |
| | : | **(Jones, J.)** |
| **v.** | : | **(Mannion, M.J.)** |
| | : | |
| **THE UNITED STATES OF AMERICA,** | : | |
| **E. FISHER,** | : | |
| **JOHN DOE #1, AND** | : | |
| **JOHN DOE #2,** | : | |
| **Defendants** | : | **Filed Electronically** |

## DEFENDANT EARL FISHER'S OBJECTION
## TO REPORT AND RECOMMENDATION

Defendant Earl Fisher respectfully submits this objection to the March 2,

2012 Report and Recommendation.  The Recommendation has two essential flaws.

First, it notes issues of fact that relate to claims against the United States, and not

to Defendant Fisher.  Second, it does not adequately address the second element of

the Saucier test.[1]

Smith claims on July 16, 2008, while talking with several inmates, one of

the inmates told Smith to watch his back, which he allegedly recounted on an

Inmate Request to Staff form that he provided to Fisher and later in a conversation

---

[1]Saucier v. Katz, 533 U.S. 194, 200-02 (2001) (noting two-part test to
determine if government officials enjoys qualified immunity).

with Fisher that same day.   Days later, Smith then allegedly overheard a

conversation between an inmate "Rico" and another inmate (both inmates were not

present during the "watch your back" conversation on July 16, 2008).  Smith

allegedly brought his concern about inmate "Rico" to other staff's attention.

There is no dispute that Fisher had no communication with Smith after July 16,

2008, and no evidence that Fisher became aware of Smith's conversations with

other staff members about a particular inmate after July 16, 2008.  Thus, this Court

must determine whether the July 16, 2008 Inmate Request to Staff and the alleged

conversation between Fisher and Smith that same day put Fisher on notice that

Smith faced a substantial risk of serious harm.

     Moreover, the second prong of Saucier requires that this Court to do more

than note it is clearly established that the Eighth Amendment prohibits deliberate

indifference to a substantial risk of serious harm.[2]  As the Third Circuit has

recently reiterated, a district court  must specifically examine the facts of each case

to determine whether a government official violates a clearly established right.

See Marcavage v. National Park Serv., 666 F.3d 856 (3d Cir. 2012) (reiterating

---

[2]The Recommendation erroneously concludes that Fisher dedicated one
paragraph to the second-prong of the qualified immunity analysis, and thus, he
essentially conceded the issue.  To the contrary, Fisher does not concede the issue
of clearly established right, and the analysis succinctly contained a summary of the
law cited throughout Fisher's brief.

that a "right must be 'clearly established . . . in light of the specific context of the case'") (quotation omitted).  Here, a reasonable officer in Fisher's situation would not have known that the inmate who actually attacked Smith posed any threat to Smith's safety.

## I.  Procedural History

On April 29, 2011, Fisher filed a motion for summary judgment, brief in support, and statement of material facts.   Smith responded with an opposition brief and opposition to the statement of material facts on June 3, 2011.  Fisher filed a reply brief on June 17, 2011.  A Report and Recommendation, recommending the denial of Fisher's motion, was issued on March 2, 2012.  Fisher files the following objection to the Recommendation.

## II.  Factual Background

The Recommendation notes the following facts are undisputed for summary judgment purposes.[3]

Fisher's Alleged Involvement

On July 16, 2008,  Smith, known by other inmates as "Smitty," overheard a conversation by other inmates in his unit that Smith knew that an inmate currently

---

[3]Defendant Fisher only agrees to admit these facts for summary judgment purposes.  Even if the Court looks at the evidence in the light most favorable to Smith, his claims fail as a matter of law against Fisher.

in protective custody (the "P.C. Inmate") testified against his co-defendants because Smith had previously done legal work for the P.C. Inmate.  See Statement of Material Facts ("SMF" at Doc. No. 34) ¶¶ 1-4.  Smith replied that the P.C. Inmate's cell-mate violated the P.C. Inmate's privacy by going into his locker to look at his legal work and then told others about what was found.  See id. ¶¶ 4-5.

Later that day, a few inmates who were members of the gang the "Gangster Disciples," including the P.C. Inmate's cell-mate, "got into a light dispute," about the P.C. Inmate's privacy being violated.  As the inmates left the area, Smith heard one of the inmates say "yeah, Smitty, watch your back."  See id. ¶¶ 6-10. Thereafter, Smith wrote out a BOP form entitled "Inmate Request to Staff," otherwise known as a "cop-out," about this encounter and slipped it under his counselor Defendant Fisher's door.  See id. ¶¶ 11-13.[4]  The Inmate Request to Staff provides:

> I been having conversation with [the P.C. Inmate's]'s friends in this unit about how disturbed they were about me making commits (sic) about how they was telling other inmates about [the P.C. Inmate] telling on his co-defendants. [The P.C. Inmate] and other inmates in

---

[4]The Bureau of Prisons did not have copies of the three "Inmate Requests To Staff" or "cop-outs" until Smith attached them to his Complaint.  Smith claims he had additional copies of these forms because he copied it word for word.  Smith also claims that although he drafted the first cop-out on July 16, 2008, he misdated the form July 9, 2008 - July 9 appears in the Complaint, and in Smith's administrative remedies.

this unit told me that I may need to watch my back.  I will appreciate
that you will have something done about this, so nothing will happen
to me.

Id. ¶ 14.[5]

Later that day, Smith spoke to Fisher about the cop-out, and Fisher said he

would talk to the P.C. Inmate's cell-mate and then give him a response to the cop-

out. See id. ¶¶ 15-17.  Smith thanked Fisher and went back to "normal activities."

See id. ¶ 18.

The Recommendation noted that there was an issue of fact as to whether

Smith said to Fisher that he feared for his safety.  Smith's deposition, upon which

the Recommendation relies, confirms there is no issue of fact, as Smith said he did

not tell Fisher he feared for his safety.   See Smith Dep. (Ex. A to SMF) at 99 ¶ 17

to 100 ¶ 4.  Smith stated:

> Q   Did you tell Mr. Fisher that you feared for your life, for your
> safety?
> A   No, I didn't tell him that I feared for my safety.  But based on
> what I had explained to him in the cop-out, he looked at it as he
> alleged that he did.  I pretty much said that I kind of feared for my
> life.
> Q   But did you tell him that you feared for your life?
> A   No, I didn't.
> Q   Did you tell him that you feared for your safety?
> A   No.

---

[5]Fisher agrees with the Smith as to the contents of the Informal Remedy
allegedly provided to Fisher.

5

> Q   Did you tell him that you wanted to go to the SHU for protection?
> A   I asked him could something be done about this.
> Q   Did you ask him if you could go to the SHU for your protection?
> A   No, I didn't ask him.

Id.   Rather, Smith argues that Fisher should have known Smith's was in danger

by the substance of the July 16, 2008 cop-out.   Smith also argues that he did not

have to ask to be placed in the SHU because he believed Fisher would protect him.

Similarly, Smith claims that Fisher should have known to transfer him out of the

unit because of the cop-out and his conversation with him.

Smith offers no other evidence of Fisher's involvement in this case from

this point on.   This is where Smith's involvement in this case ends.   The following

facts are offered for the Court's informational purposes only.

Facts Not Related To Fisher

The next day, July 17, Smith went to work at UNICOR and during a break,

two inmates approached Smith to tell him that other inmates said that Smith

needed to leave the unit or something was going to happen to him.   See id. ¶ 19.

When Smith got back to his unit after work around 3:30 p.m., Smith provided

another cop-out to the officer-in-charge (not Fisher).   See id. ¶¶ 20-22.   This cop-

out provides:

> Officer of the unit I am learning from other inmates in this unit that
> [the P.C. Inmate]'s cellmate and his friends have been telling other
> inmates that the staff here better find me another housing unit because
> something is going to happ[en] to me very soon if I am her[e] for
> much longer.
>
> I think it would be best if I can be moved to another unit.

Id. ¶ 23.

Shortly thereafter, Smith provided the officer another cop-out after he overheard the P.C. Inmate's cell-mate yelling to an inmate, known as "Rico," that Smitty "don't know how to mind his business" and Rico responded that he wanted to deal with that issue.  See id. ¶¶ 24-28.  Smith stated that he asked the officer-in-charge to do something about his cop-out, and the officer said he would talk to the inmates, but a transfer was probably unlikely.  See id. ¶¶ 28-30.  The cop-out provides:

> I am complaining about another inmate who had threatening me.  He
> stated that I needed my head busted open because I didn't know how
> to mind my business about him and his cell-mate.  This inmate live[s]
> in cell 121 and sleeps on the bottom bunk.  Can you please have
> something done about this.

Id.

The next day, July 18, Smith went to work at UNICOR, Rico came over to the table where Smith and another inmate were talking and told Smith that he had

7

Smith's dictionary and Smith could come by later to Rico's cell and retrieve it.
See id. ¶¶ 32-34.

The night of July 18, Smith went up to Rico's cell.  Smith thought Rico was
going to give him back his book, but his next memory is being released from a
hospital and being put on a plane.  See id. ¶¶ 35-38.

During this time, Smith never asked to be transferred, did not ask to be
placed in protective custody, and never told any prison official that he feared for
his safety.  See id. ¶¶ 39-42.

### III.  Questions Presented

Whether this Court should sustain the Objection and grant summary
judgment to Defendant Fisher because he is entitled to qualified
immunity?

**Suggested Answer:** Affirmative.

### IV.  Argument

A.     **STANDARDS OF REVIEW**

If a party objects to a report and recommendation, a district court makes "a
de novo determination of those portions of the report or specified proposed
findings or recommendations made by the magistrate judge to which there are
objections."  See Smith v. United States, (M.D. Pa. Dec. 3, 2007) (citing United
States v. Raddatz, 447 U.S. 667 (1980); 28 U.S.C. § 636(b) (1); Local Rule 72.3l).

8

A recommendation is just that, a recommendation.  Thus, a district court may, in whole or in part, adopt, reject, or modify it.  <u>See</u> Local Rule 72.3; <u>Henderson v. Carlson</u>, 812 F.2d 874, 877 (3d Cir.1987).

**B.  FISHER ENJOYS QUALIFIED IMMUNITY BECAUSE SMITH HAS NOT AND CANNOT PRODUCE EVIDENCE THAT FISHER KNEW OR SHOULD HAVE KNOWN THAT SMITH WOULD BE ATTACKED BY AN INMATE**

The Recommendation erroneously notes that "[t]he parties dispute the extent of Fisher's knowledge and involvement with regard to the risk to Smith's safety, and also whether or not the information provided by Smith rose to the level of putting the officers, including Fisher, on notice that he may be facing a substantial risk of serious harm."

First, whether or not other officers may have knowledge that put them on notice of Smith facing a substantial risk of serious harm has no relevance to the analysis this Court must make as to Fisher.  As the Court is well aware, the test whether a prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists is a subjective one.  <u>See Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 125 (3d Cir. 2001).  Here, there is no evidence that Fisher had any notice of any cop-outs or the conversations with the other officers after July 16, 2008.

9

Second, there is no issue of fact (for summary judgment purposes) as to what Fisher was told by way of the cop-out, which speaks for itself, and what Smith told Fisher on July 16, 2008.  The issue remains whether the cop-out and the substance of that alleged conversation put Fisher on notice that Smith may face substantial risk of serious harm.

In Saucier v. Katz, 533 U.S. 194, 200-02 (2001), the Supreme Court enunciated a two-part test for qualified immunity.  First, a court must determine whether the facts "taken in a light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right."  Second, if a constitutional right would have been violated under the plaintiff's version of the facts, a court must determine "whether the right was clearly established."  Id.  Or stated in another way, would a reasonable officer know that the action he took was unlawful.  See id. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

In Pearson v. Callahan, 129 S. Ct. 808, 822 (2009), the United States Supreme Court held that a district court may first determine whether the constitutional right was clearly established, and therefore, a district court may not even have to address whether a defendant violated a constitutional right.

10

In determining whether a right is clearly established, "the Third Circuit has demanded 'some but not precise factual correspondence between relevant precedents and the conduct at issue.'"  Ravitch v. City of Phila., Civ. A. No. 06-3726, 2009 WL 878631, at *12 (E.D. Pa. Mar. 31, 2006) (citing In re City of Phila. Litig, 49 F.3d 945, 970 (3d Cir. 1995) (citing Ryan v. Burlington County, 860 F.2d 1199, 1208-09 (3d Cir. 1988) (quotations omitted in original))).  A court must also look at the information possessed by the defendant at the time of the alleged constitutional violation and how a reasonable official would have reacted. See id. (citing Anderson v. Creighton, 483U.S. 635, 641 (1987); Reitz v. County of Bucks, 125 F.3d 139, 147 (3d Cir. 1997)).  Thus, the court should look at the entire episode confronted by the officer and take into account any reasonable mistake made by an officer.  See Kelly v. Borough of Carlisle, No. 1:07-cv-1573, 2009 WL 1230309, at *3 (M.D. Pa. May 4, 2009) (Kane, J.) (quoting Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995)).

1.     **Defendant Fisher Did Not Violate Smith's Eighth Amendment Rights**

Smith was attacked by an inmate who Smith did not even consider a threat until days after his alleged conversation with Fisher on July 16, 2008. Nonetheless, the statement "watch your back" does not put Fisher on notice that Smith may be subject to any risk of harm, let alone a substantial risk of harm.  The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  To demonstrate a violation of the cruel and usual punishment clause of the Eighth Amendment, an inmate must show: 1) "the deprivation alleged must be, objectively, 'sufficiently serious,'" and 2) the prison official had a "'sufficiently culpable state of mind.'"   Farmer v. Brennan, 511 U.S. 825, 828 (1994) (quoting Wilson v.  Seiter, 501 U.S. 294, 297, 302-03 (1991); Hudson v. McMillian, 503 U.S. 1, 5 (1992).

A prison official must take reasonable steps to protect inmates from the violence of other inmates, as "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Farmer, 511 U.S. at 834 (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Although "prison officials have a duty to protect prisoners from violence at the hands of other prisoners," "[i]t is not . . . every injury suffered by one prisoner at

the hands of another that translates into constitutional liability for prison officials." Id. at 833-34.

The Supreme Court has held "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Id. at 828. For an inmate to prove deliberate indifference, he must show that he was incarcerated under conditions posing a substantial risk of serious harm; 2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists;" 3) the defendant actually drew this inference; and 4) the defendant deliberately disregarded the apparent risk. Id. at 837.

The test whether a prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists is a subjective one. See Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001) Thus, "the prison-official defendant must actually have known or been aware of the excessive risk to inmate safety." Id. The inmate can show knowledge through circumstantial evidence where the risk is to the inmate's safety is "obvious." Farmer, 511 U.S. at 842. Other circumstantial evidence would include the defendant being exposed to evidence of a risk that is "long-standing, pervasive,

13

well-documented, or expressly noted by prison officials in the past."  See id. at

842-43.

The general knowledge that prisons are dangerous places, however, is not

an obvious risk and does not rise to the level of an Eighth Amendment violation.

See Lyons v. Beard, No. 3:07-cv-444, 2011 WL 398273, at *9 (M.D. Pa. Jan. 10,

2011), adopted, 2011 WL 441802, at *1 (M.D. Pa. Feb. 3, 2011) (citing Jones v.

Beard, 145 F. App'x 743 (3d Cir. 2005)).  In addition, "'[a] pervasive risk of harm

may not ordinarily be shown by pointing to a single incident or isolated incidents,

but it may be established by much less than proof of a reign of violence and

terror.'"  Paulino v. Burlington County Jail, No. 07-5315, 2010 WL 5186096, at

*4 (D.N.J. Dec. 14, 2010) (citing Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir.

1985)); see also Whitley v. Albers, 475 U.S. 312, 319 ("It is obduracy and

wantonness, not inadvertence or error in good faith, that characterize the conduct

prohibited by the Cruel and Unusual Punishments Clause.").

In Davis v. Williams, 354 F. App'x 603, 605-06 (3d Cir. 2009), an inmate

complained to mental health counselor that another inmate in his unit had accused

him of being a child molester and the counselor said she would take care of it.

See id.  This accuser shoved the plaintiff several times during a basketball game,

and two weeks later punched the plaintiff in the face, breaking his jaw.  In

14

affirming the district court, the Third Circuit held that the mental health counselor did not disregard a substantial risk of serious harm to the plaintiff.  See id.  The court reasoned that the plaintiff never voiced a specific threat of harm, and never requested a transfer out of the unit.  See id.

In O'Connell v Williams, 241 F. App'x 55, 58 (3d Cir. 2007), the Third Circuit has found summary judgment proper where an inmate repeatedly requested a new cell-mate because they were "not getting along."  See id.  (holding no evidence that staff were or should have been aware of serious threat to inmate).  In Wise v. Ranck, 340 F. App'x 765, 767 (3d Cir. 2009), the court held that knowledge by staff that an inmate's cell-mate had a history of anti-social behavior and that inmate informed staff that he was having arguments with his cell-mate and he feared those arguments would become physical did not provide staff with the requisite knowledge that there was serious threat to the inmate.  See id.  In Counterman v. Warren County Corr. Facility, 176 F. App'x 234, 239 (3d Cir. 2006), the Third Circuit held that staff's knowledge that an inmate was being verbally harassed and subject to unpleasantness did not put them on notice that inmate was subject to "an objectively intolerable risk of harm."  Id.

Courts look to see if there is evidence of a specific threat.  See Lyons, 2011 WL 398273, at *15 (granting summary judgment in part, holding that information

15

to prison officials that "guards have it in for me [and have] been going to inmates, setting up a contract" does not put the prison officials on notice of a substantial risk of serious harm to an inmate); Paulino, 2010 WL 5186096, at *5 (holding inmate, who did not voice specific threat for his safety or asked to be protected and who only told staff that other inmates wanted to "control everything," had not produced evidence to survive summary judgment as to the Eighth Amendment claim).

Here, Smith testified that he did not inform Fisher that he feared for his safety, he wanted to be put in protective custody, or wanted to be transferred.  See SMF ¶¶ 39-42.   All Fisher allegedly knew was that an inmate told Smith he "may" need to watch his back because they were upset about Smith's comments about the P.C. Inmate's cell-mate.  See Wise, 340 F. App'x at 766 (noting that, in prison, inmates commonly threaten each other and those threats do not under all circumstances impute knowledge of a substantial risk of serious harm) (citing Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998)).  The alleged fact that Fisher was aware that Smith was told to maybe "watch your back" is in line with the inmate in Davis that was called a "child molester" and was shoved, see 354 F. App'x at 605-06, the inmate in O'Connell that was not "getting along" with his cell-mate, 241 F. App'x at 58, the inmate in Wise that was having arguments with

16

his cell-mate that he feared would become physical, 340 F. App'x at 767, and the

inmate in <u>Counterman</u> that was subject to verbal harassment and unpleasantness,

176 F. App'x at 239.  In all cases the Third Circuit found in favor of prison staff.

Most importantly, the attack suffered by Smith was at the hands of an

inmate who was not a party to the initial July 16, 2008 cop-out.  Smith offers no

evidence of how Fisher could be aware that "Rico" would assault Smith.  Indeed,

Smith, himself, had no idea that "Rico" posed a threat to him until July 17, 2008,

and Smith did not report that to Fisher.  <u>See</u> SMF ¶¶ 24-31.  Even after Rico said

he would "deal" with the issue, Smith's own actions demonstrate that he did not

fear for his safety, as he had a causal conversation with Rico on July 18, 2008, and

even went to Rico's cell that night.  <u>See</u> <u>id.</u> ¶¶ 32-37.  Fisher could not anticipate

from the "may need to watch my back" cop-out that Rico was a "specific threat" to

the safety of Smith.  Thus, Smith's alleged proof does not "meet the exacting

standards of subjective knowledge under the Eighth Amendment." <u>See</u> <u>Lyons</u>,

2011 WL 398273, at *15; <u>Paulino</u>, 2010 WL 5186096, at *5.

Accordingly, this Court should find that Fisher did not violate Smith's

constitutional rights and find he enjoys qualified immunity.

## 2.    **Fisher Did Not Violate A Clearly Established Right**

A reasonable officer in Fisher's situation would not have known that Rico posed any threat to Smith's safety.   As noted in the Third Circuit decisions above, the information possessed by the prison officials did not give them notice of a substantial risk of harm to the respective inmates.  See Davis, 354 F. App'x at 605-06; O'Connell, 241 F. App'x at 58; Wise, 340 F. App'x at 767; and Counterman, 176 F. App'x at 239.  It was not clearly established that an inmate who was told to watch his back would be in danger of being assaulted.  Fisher's action were not plainly incompetent or knowingly violate Smith's rights. McLaughlin v. Watson, 271 F.3d 566, 570 (3d Cir. 2001) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  Smith did not request a transfer, ask to be in protective custody, or tell anyone he was afraid.

When looking at the entire episode as a whole, Fisher acted reasonably, as a reasonable officer in Fisher's situation would not have known that inmate Rico was an inmate or part of a class of inmates that posed any threat to Smith's safety.  The general notion that associates of snitches or those that have done legal work for snitches face a serious risk of bodily harm is not clearly established.

Accordingly, this Court should grant summary judgment in favor of Defendant Fisher.

18

## V. Conclusion

In light of the aforementioned, Defendant Fisher respectfully request that the Court sustain its objection and grant summary judgment to him.

Respectfully submitted,

PETER J. SMITH
United States Attorney


s/Michael J. Butler
Michael J. Butler
PA 81799
Cynthia E. Roman
Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17701
Tel: (717)221-4482
Fax: (717)221-4493
Michael.Butler@usdoj.gov

Date: March 19, 2012

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN A. SMITH,** | : | **No. 4:10-CV-781** |
| **Plaintiff** | : | |
| | : | **(Jones, J.)** |
| **v.** | : | **(Mannion, M.J.)** |
| | : | |
| **THE UNITED STATES OF AMERICA,** | : | |
| **E. FISHER,** | : | |
| **JOHN DOE #1, AND** | : | |
| **JOHN DOE #2,** | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on March 19, 2012, she served a copy of the attached

## DEFENDANT EARL FISHER'S OBJECTION
## TO REPORT AND RECOMMENDATION

via the Court's electronic case filing system to the electronic mail address stated below,

Carolyn E. Budzinski, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

s/ Cynthia E. Roman
Cynthia E. Roman
Paralegal Specialist